**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **KATHRYN SNEED and SNEED EQUESTRIAN ESTATES, LLC,** *Plaintiffs*, v. **JEFFREY GIBBS, CALLI ROUSE, GIBBS SHOW HORSES, CALLI ROUSE SHOW HORSES, BLACK BIRD RANCH, THE BONAPARTE FAMILY LIVING TRUST, FRANK BONAPARTE, PATRICIA BONAPARTE, FRANK BONAPARTE IN HIS CAPACITY AS CO-TRUSTEE OF THE BONAPARTE FAMILY LIVING TRUST, PATRICIA BONAPARTE IN HER CAPACITY AS CO-TRUSTEE OF THE BONAPARTE FAMILY LIVING TRUST, JUSTIN SCHMIDT, JEANNIE SCHMIDT, HAILO INVESTMENTS, LLC, DR. CAMERON STOUDT DONNELL, AND EQUINE SPORTS MEDICINE AND REHABILITATION,** *Defendants*. | **CIVIL ACTION NO. 4:23-CV-00871-ALM** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiffs, Dr. Kathryn Sneed and Sneed Equestrian Estates, LLC ("Sneed" or "Plaintiffs") file this First Amended Complaint against the Defendants named below (collectively, "Defendants"), and allege as follows:

## NATURE OF THE CASE

1. Dr. Kathryn Sneed is the owner of Sneed Equestrian Estates, LLC. She has had a passion for horses her entire life, riding and showing horses throughout her childhood years. Dr. Sneed currently owns over thirty horses, which includes over ten American Quarter Horse Association (AQHA), American Paint Horse Association (APHA), and National Snaffle Bit Association (NSBA) world champions.

2. Sneed files this Complaint with respect to five of her horses: Bank on the Best ("Cash"), PartyLikeYouMeanIt ("Faith"), Avante Garde ("Ava"), Mighty Hot Gal ("Bella"), and A Sudden Wonder ("Sudden") (collectively, the "Sneed Horses"), seeking relief against Defendants for damages stemming from negligent and abusive care of the above-mentioned horses.

3. From the Summer of 2022 until August 2023 Defendants had the Sneed Horses in their care, custody, and control. During that time period, the Sneed Horses suffered from neglect, abuse, drugging, illness, injury, inadequate nutrition, and misrepresentations with respect to development and care. One of the horses ("Ava") had to be euthanized. The other horses have suffered illness and injury, with long-term health and economic consequences.

## JURISDICTION AND VENUE

4. This Court has jurisdiction, under 28 U.S.C. § 1332, because the amount in controversy, exclusive of costs and interest, exceeds $75,000 and there is complete diversity of citizenship between the Parties. Defendants are subject to general and personal jurisdiction in Texas because Defendants are residents and citizens of the State of Texas, or have established the requisite minimum contacts with Texas, and have purposefully availed

themselves by conducting activities in Texas, thereby establishing a substantial connection with the state.

5. Venue is proper, under 28 U.S.C. § 1391(b)(1) and (b)(2), because Defendants reside in this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

6. Plaintiff Kathryn Sneed is an individual citizen and resident of Shelby County, Tennessee.

7. Plaintiff Sneed Equestrian Estates, LLC is a Tennessee Limited Liability Company, whose principal place of business is Shelby County, Tennessee.

8. Defendant Jeffrey Gibbs is a resident and citizen of Texas and can be served with process at: 9017 Chisholm Trail, Crossroads, Texas 76227 or wherever he may be found.

9. Defendant Calli Rouse is a resident and citizen of Texas and can be served with process at: 9017 Chisholm Trail, Crossroads, Texas 76227 or wherever she may be found.

10. Gibbs Show Horses is a Texas business, owned by Defendant Jeffrey Gibbs, who can be served with process at: 9017 Chisholm Trail, Crossroads, Texas 76227.

11. Calli Rouse Show Horses is a Texas business, owned by Defendant Calli Rouse, who can be served with process at: 9017 Chisholm Trail, Crossroads, Texas 76227.

12. Defendant Black Bird Ranch is an equestrian facility located in Denton County, Texas and can be served with process by serving Frank Bonaparte or Patricia Bonaparte at: 1623 Mockingbird Lane, Southlake, Texas 76092 or through their attorney of record, James C. Erdle, Jr. Glast, Phillips & Murray, P.C. 14801 Quorum Drive. Suite 500. Dallas, Texas 75254.

13. Defendant The Bonaparte Family Living Trust is a Texas Trust and can be served with process by serving Frank or Patricia Bonaparte at: 1623 Mockingbird Lane, Southlake, Texas 76092 or through their attorney of record, James C. Erdle, Jr. Glast, Phillips & Murray, P.C. 14801 Quorum Drive. Suite 500. Dallas, Texas 75254.

14. Defendant Frank Bonaparte is a resident and citizen of Texas and can be served with process at: 1623 Mockingbird Lane, Southlake, Texas 76092 or through his attorney of record, James C. Erdle, Jr. Glast, Phillips & Murray, P.C. 14801 Quorum Drive. Suite 500. Dallas, Texas 75254, or wherever he may be found.

15. Defendant Patricia Bonaparte is a resident and citizen of Texas and can be served with process at: 1623 Mockingbird Lane, Southlake, Texas 76092 or through her attorney of record, James C. Erdle, Jr. Glast, Phillips & Murray, P.C. 14801 Quorum Drive. Suite 500. Dallas, Texas 75254, or wherever she may be found.

16. Defendant Frank Bonaparte—in his capacity as co-Trustee of the Bonaparte Family Living Trust—is a resident and citizen of Texas and can be served with process at: 1623 Mockingbird Lane, Southlake, Texas 76092 or through his attorney of record, James C. Erdle, Jr. Glast, Phillips & Murray, P.C. 14801 Quorum Drive. Suite 500. Dallas, Texas 75254, or wherever he may be found.

17. Defendant Patricia Bonaparte—in her capacity as co-Trustee of the Bonaparte Family Living Trust—is a resident and citizen of Texas and can be served with process at: 1623 Mockingbird Lane, Southlake, Texas 76092 or through her attorney of record, James C. Erdle, Jr. Glast, Phillips & Murray, P.C. 14801 Quorum Drive. Suite 500. Dallas, Texas 75254, or wherever she may be found.

18. Defendant Justin Schmidt is a citizen of Idaho and can be served with process at: 10631 Osburn Road, Pilot Point, Texas 76258 or through his attorney of record, Jeffrey Wolf. The Wolf Law Firm, P.C. 1360 N. White Chapel Blvd. Suite 100, Southlake, Texas 76092, or wherever he may be found.

19. Defendant Jeannie Schmidt is a citizen of Idaho and can be served with process at: 10631 Osburn Road, Pilot Point, Texas 76258 or through her attorney of record, Jeffrey Wolf. The Wolf Law Firm, P.C. 1360 N. White Chapel Blvd. Suite 100, Southlake, Texas 76092, or wherever she may be found.

20. Defendant Hailo Investments, LLC is a Wyoming LLC with its principal place of business in Idaho. Hailo Investments, LLC's sole member is its Chief Executive Manager, Justin Schmidt, and can be served with process through its registered agent, Registered Agents Inc. at 30 N. Gould Street, Suite R, Sheridan, Wyoming 82801 or through its attorney of record, Jeffrey Wolf. The Wolf Law Firm, P.C. 1360 N. White Chapel Blvd. Suite 100, Southlake, Texas 76092.

21. Defendant Dr. Cameron Stoudt Donnell (aka Cameron Stoudt) is a resident and citizen of Texas and can be served with process at: 396 Orchard Road. Whitesboro, Texas 76273 or wherever she may be found.

22. Defendant Equine Sports Medicine and Rehabilitation is a Texas business and can be served with process at: 396 Orchard Road. Whitesboro, Texas 76273.

### BACKGROUND FACTS

23. Beginning in approximately June 2022, Sneed entered into agreements with Jeffrey Gibbs ("Gibbs"), Calli Rouse ("Rouse"), Gibbs Show Horses, and Calli Rouse Show Horses (collectively, "the Gibbs Defendants") for the care and training of the Sneed Horses in

Texas. On social media, Gibbs Show Horses states that "Jeffrey & Calli train, develop & show yearlings to finished horses."

24. Sneed was promised, and was charged for board, grain, care, training, showing, and turnout on a regular basis. Sneed paid the Gibbs Defendants $1,650 per horse, per month ($900 for board and grain; $750 for training). The Gibbs Defendants consistently represented to Sneed that they would care for and train the Horses in a manner consistent with the highest industry standards. The Gibbs Defendants initially boarded the Sneed Horses on property owned by Hailo Investments, LLC ("Hailo") and managed by Justin and Jeannie Schmidt ("the Schmidt Defendants").

25. Upon information and belief, the Schmidt Defendants, and vicariously, Hailo, permitted a strangles-infected horse onto their property without taking proper and necessary precautions against the spread of the highly infectious disease.[1]

26. The standard of care to prevent a strangles outbreak is to minimize the exposure risks to other horses. According to UC Davis' Veterinary Medicine Center for Equine Health, horses that are newly introduced onto a farm or boarding facility should be observed and their temperature monitored twice a day for at least two weeks before being housed with

---

[1] "Strangles is a highly contagious disease of the equine upper respiratory tract caused by the bacterium *Streptococcus equi* subspecies *equi* (*S. equi*). The bacteria cross mucous membranes in the nose and mouth to infect lymph nodes where they cause abscesses that can eventually rupture. The infected lymph nodes become swollen, which can compress the upper respiratory tract (hence, the name strangles). The disease occurs worldwide and is the most common infectious agent identified in horses 6 to 10 years of age. Horses become infected through inhalation or ingestion of the bacterium. This can occur through horse-to-horse contact, drinking contaminated water, or making contact with infected material or equipment. . . . The best strategy to prevent strangles is to minimize exposure risks. Horses that are newly introduced onto a farm should be observed and temperature monitored twice a day for at least two weeks before being housed with resident horses. Horses with temperatures over 101.5 F should be isolated. Vaccination is recommended on farms where strangles is a persistent problem or there is a high risk of exposure. When cases of strangles occur, any organic material that infected horses came into contact with should be removed from the property. Contaminated equipment and facilities should be properly cleaned and disinfected. Handlers should wash and sanitize hands before contact with individual horses and should work with sick horses after work with healthy horses has been completed for the day. Pastures and stables that contained infected horses should be rested for 4 to 6 weeks." UC Davis Veterinary Medicine Center for Equine Health.

resident horses. Horses with temperatures over 101.5 Fahrenheit should be isolated. When cases of strangles occur, any organic material that infected horses came into contact with should be removed from the property. Contaminated equipment and facilities should be properly cleaned and disinfected. Handlers should wash and sanitize hands before contact with individual horses and should work with sick horses after work with healthy horses has been completed for the day. Pastures and stables that contained infected horses should be rested for 4 to 6 weeks.

27. The Schmidt Defendants and Hailo failed to exercise the above-mentioned standard of care.

28. On or about December 9, 2022, Jeffrey Gibbs and Calli Rouse transported the stallion, Cash,[2] as well as the other Sneed Horses to the Black Bird Ranch ("the Ranch"), a facility owned and operated by The Bonaparte Family Living Trust, and under the control of co-Trustees Frank Bonaparte and Patricia Bonaparte (collectively, "the Bonaparte Defendants"). Around one month later, on or about January 16, 2023, Cash was then moved to EE Ranch ("EE") in Whitesboro, Texas. Almost immediately the staff at EE noticed the symptoms of strangles and contacted a veterinarian. On or about January 21, 2023, EE notified Sneed that Cash was in isolation. On or about January 24, 2023, Cash was taken to a veterinarian, where the stallion remained under treatment until about February 21, 2023.

29. When the Ranch took possession of Cash, a duty of care was created on the part of the Trust, and by extension, its co-trustees, Frank and Patricia Bonaparte. The Bonaparte

---

[2] Cash is an 8-time World/Reserve World Champion, 2016 AQHA/APHA Stallion sired by Lopin My Best. Showcased at the 2029/2020 APHA World Show, Cash was named World Champion Green Western Pleasure, World Champion Amateur Performance Stallion, and World Champion Open Performance Stallion.

Defendants' breach of that duty proximately caused injury to Sneed's stallion, Cash, and by extension her commercial interests in the stallion. In addition, the Bonaparte Defendants failed to communicate with Sneed and did not inform her of the strangles outbreak.

30. Damages with respect to Cash include, but are not limited to the following:

   - Medical Care (hospitalization, vet care, exams, bloodwork, and ongoing medications).
   - Rise in insurance premium (which now contains a strangles exclusion).
   - Loss of breeding due to absence of cooled semen. Cash produced no cooled semen all season.
   - Potential total loss of fertility.
   - Additional boarding costs.
   - Sneed has 11 personal mares open due to no available semen, and she has had to pay stud fees for stallions due to not having her own stallion to collect on.

31. From August 10 – August 20, 2023, the Gibbs Defendants attended the National Snaffle Bit Association World Championship Show and Breeders Championship Futurity in Tulsa, Oklahoma ("NSBA").

32. Early on the morning of August 10, 2023, Sneed sent a text message to Calli Rouse, checking on her horse Faith and inquired about the Gibbs Defendants arrival at NSBA. Rouse stated they would start showing the next day, assuring Sneed that all was well with the Horses. Then, shortly thereafter, at approximately 7:25 a.m., Rouse sent a text message to Sneed stating they had called a veterinarian, Dr. Cameron Stoudt ("Dr. Stoudt"), co-owner of Equine Sports Medicine and Rehabilitation ("ESMR") (collectively, the "Stoudt Defendants") to go to the Ranch and check on the horse, Ava. Apparently, the mare "wasn't eating well, and was lethargic." Shortly thereafter, Rouse informed Sneed that they were starting fluids on Ava.

33. At approximately 9:30 a.m. on August 10 (a full 2 hours later), Dr. Stoudt and Sneed spoke via telephone. Dr. Stoudt informed Sneed that Gibbs had called around 7 a.m., stating it

was an emergency. Dr. Stoudt stated that Ava was "down in her stall," and had been that way when she arrived. Ava was not getting up, and Dr. Stoudt took an x-ray of the horse's neck. Dr. Stoudt then informed Sneed that the mare had a fractured vertebrae at the area where the neck and chest meet. She informed Sneed that the prognosis was poor and advised euthanasia. Dr. Stoudt stated she had sent the x-ray to a neck surgeon who also advised against trying to save the mare.

34. Sneed then contacted Dr. Eric Johnson, a veterinary surgeon in Kentucky, for a second opinion. The x-rays were sent to Dr. Johnson via email for his review. Dr. Johnson called Sneed and stated that while he did not see a fracture, the disc was dislocated severely. Dr. Johnson asked for a ventral-dorsal view of the spine. Dr. Stoudt stated that view would be difficult to get, but that she would try. Dr. Stoudt then sent a poor-quality x-ray to Sneed, who forwarded it to Dr. Johnson. After consulting with colleagues, Dr. Johnson called Sneed, noting several times that this type of injury (in his opinion and in the opinion of his two colleagues) would have occurred only through extreme trauma. Dr. Johnson stated that the horse looked "wrecked" when he first saw the image.

35. Sneed then called Dr. Claunch, another veterinarian in Texas, hoping to get another opinion, and enquired about the possibility of an on-site inspection prior to euthanizing the mare. Dr. Claunch, after reviewing the x-rays, called Sneed and stated that this type of injury could only occur in one of three ways: 1) by running into a fixed object with the head down, 2) a rotational fall, or 3) by flipping over. Dr. Claunch determined there was a collapsed disc/fractured vertebral body that was collapsed into the spinal cord, thereby paralyzing the horse. Only then did Sneed then give Dr. Stoudt permission to euthanize the mare.

36. Sneed's husband, Darrell Sneed, then contacted Frank Bonaparte, the owner (by virtue of being co-Trustee of the Trust) of the barn where Ava was stabled, asking for video footage of the mare's stall. Darrell Sneed specifically asked when Ava had last been out of her stall. Bonaparte stated his "IT guy" would have to get back to him. Bonaparte called Darrell Sneed back within a few minutes and sent one photograph, claiming it was the night before, at 9:50 p.m. Bonaparte stated he could not send any more video footage, could not send anything with a date stamped on the footage, and only had footage going "back 72 hours." Bonaparte claimed the mare had "eaten all of her food the night before" and was acting "normal." But blood lab work, taken from the mare at 8:05 a.m. on August 10, 2023, shows elevated WBC and lymphocytes, as well as dehydration. The photo sent by Dr. Stout also showed swelling in the legs of the mare.

37. Multiple witnesses have provided a description of the training methods used on Ava and other horses by Jeffrey Gibbs and Calli Rouse while the horses were on the Schmidt's, Hailo's, and Bonaparte's property. Upon information and belief, one witness who had been an intern with Gibbs Show Horses, stated that the Gibbs defendants had tied Ava up several times in her stall with her head tied up, and had also tied her head down to her chest with reins drawn under her legs and tied to the saddle. The witness stated that Gibbs had also done this by hobbling Ava's legs together and forcing the mare to run. The witness saw the mare flip over, fall, and run into things multiple times. The witness stated that if the mare did not run, Gibbs would use blunt traumatic force on her. Upon information and belief, Gibbs beat all the Horses with bats, whips, boards, and other objects found throughout the barn. The witness stated that Gibbs scolded her for not being "mean enough to the babies." In addition, the witness reported hearing Gibbs screaming foul statements at the Horses

and yelling at them after hitting them multiple times and would kick them if they did not get up when hobbled. The witness stated that she observed Gibbs put Ava up into her stall after one of these "training days" with a swollen and bloody mouth from the force of the bit in her mouth after being tied down. The mare was then left there for days.

38. Damages with respect to Ava include but are not limited to: Loss of the horse, loss of potential offspring value, training costs, hauling costs, and veterinarian fees and expenses.

39. Upon information and belief, all the Horses were exposed to Strangles after the Schmidt and Hailo Defendants permitted a trainer to bring a strangles-infected horse onto their property and remain in close proximity to Sneed's Horses. The strangles infection almost cost Cash his life, and he had no semen for the entire 2023 breeding season due to fever and illness.

40. Upon information and belief, the Stoudt Defendants were aware of the Strangles infection and did not take proper care or precautions to protect the Sneed Horses; neither did the Stoudt Defendants give notice to Sneed of the outbreak and illness.

41. Faith: In addition to the strangles that was kept secret from Sneed, upon information and belief, Faith was medicated with illegal levels of NSAID's at the NSBA show in 2023. This would have caused Sneed to have been put on a three-year probation. One of the medications found in the mare's blood is a known cause of bone rotation. The mare has also had campo phenique poured in her ears, which has damaged the soft tissue lining of her ears. This technique is illegal and is known to cause neurological problems and potentially long-term hearing loss.

42. Ava: As described above, the mare suffered from a dislocated cervical spinal vertebra in two dimensions, compression into the spinal column by tying her head around to the side

of her saddle and leaving her that way for hours and letting her lay down in the round pen. The Gibbs Defendant's neglect and abuse killed this two-year-old horse, and cost her a show career, and future offspring. Upon information and belief, established by eyewitness accounts, the Stoudt Defendants were complicit in this through their awareness of extreme abuse in the barn and through providing pain medication without proper examination in the weeks prior to Ava's death.

43. Bella: This mare suffered from a bone chip on the front right fetlock and another on her second cervical vertebra (the **same vertebra dislocated in Ava**). The mare now has to have surgery and at least sixty days off after surgery. Bella has missed the entire 2023 show season and will not be shown this whole year, if she recovers. Upon information and belief, a veterinarian has stated that the cervical chip is "trauma" related.

44. Sudden: This mare now has a bone spur in her hock and arthritic changes in her knee/carpus. Due to the negligence of Defendants, she will have to have a minimum of sixty days off.

45. The illness and injuries inflicted upon Sneed's horses while under the care and training of the Gibbs Defendants, and while under the veterinary care of the Stoudt Defendants from approximately June 2022 to approximately August 2023, took place while the Horses were stabled on properties belonging to the Schmidt, Hailo, and Bonaparte Defendants.

### CAUSES OF ACTION

**COUNT 1: BREACH OF CONTRACT (AGAINST JEFFREY GIBBS, CALLI ROUSE, GIBBS SHOW HORSES, AND CALLI ROUSE SHOW HORSES)**

46. Plaintiffs incorporate and re-allege the foregoing paragraphs by reference.

47. Plaintiffs and the Gibbs Defendants entered into an agreement for the board, training, and showing of the Horses. Sneed paid the Gibbs Defendants $1,650 per horse, per month ($900 for board and grain; $750 for training). Plaintiffs tendered performance on the agreed-upon terms.

48. Upon information and belief, Plaintiff's Horses did not receive the agreed-upon stabling, feed, training, medical care, and turnout as the parties had agreed. The Gibbs Defendants' failure to honor their obligations under the parties' agreement represents a breach of contract.

49. As a direct and proximate result of Defendants' breaches of the agreement to maintain Sneed's horses in healthy body conditions, Plaintiffs have suffered and will continue to suffer damages, including, but not limited to, reduction in the value of the Horses, lost show opportunities, lost breeding opportunities, and the loss of potential sales.

**COUNT 2: NEGLIGENCE: INJURY TO SNEED'S HORSES (AGAINST ALL DEFENDANTS)**

50. Plaintiffs incorporate and re-allege the foregoing paragraphs by reference.

51. A bailment was created when Sneed's horses were transferred into the care, custody, and control of the various Defendants at the barns/equine training and boarding facilities which they owned and oversee, or by virtue of their providing veterinary care.

52. At all times, while Sneed's horses were under the care, custody, and control of the Defendants, and on property owned by the Bonaparte, Schmidt, and Hailo Defendants, Defendants had a duty of care, which required a reasonable standard of care and the avoidance of injury, communicable disease, and death.

53. Defendants breached this duty of care by failing to exercise reasonable care in a way that is compatible with the standard of care exercised by a prudent person, with knowledge of the proper standard of care.

54. Defendants therefore caused the harm suffered by Plaintiffs through their breach of the duty of ordinary care. Defendants' acts and omissions are the actual and proximate causes of Plaintiff's harm—the spread of disease in and serious injury to the Plaintiff's Horses, including euthanization.

55. Sneed has suffered actual losses, quantified by the loss of life, loss in value of her Horses, loss of the value of future offspring, lost potential sales, loss of future earnings, additional veterinary care, rehabilitative care, increased insurance premiums, and training charges.

**COUNT 3: GROSS NEGLIGENCE: ANIMAL ABUSE AND INJURY TO SNEED'S HORSES (AGAINST JEFFREY GIBBS, CALLI ROUSE, GIBBS SHOW HORSES, AND CALLI ROUSE SHOW HORSES)**

56. Plaintiffs incorporate and re-allege the foregoing paragraphs by reference.

57. A bailment was created when Sneed's horses were transferred into the care, custody, and control of the Gibbs Defendants.

58. At all times, while Sneed's horses were under the care, custody, and control of the Gibbs Defendants, Defendants had an ordinary duty of care, which required a reasonable standard of care and the avoidance of injury, communicable disease, and death.

59. Defendants breached this duty of care by acting in a way that, objectively, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Sneed's horses. Additionally, Defendants had actual, subjective awareness of the risks involved in their abusive "training" methods, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of Sneed's Horses.

60. Defendants therefore caused the harm suffered by Plaintiffs through their acts of gross negligence. Defendants' acts and omissions are the actual and proximate causes of Plaintiff's harm.

61. Sneed has suffered actual losses, quantified by the loss of life, loss in value of her Horses, loss of the value of future offspring, lost potential sales, loss of future earnings, veterinary care, rehabilitative care, increased insurance premiums, and training charges.

62. Pleading in the alternative, the Sneed Horses were injured by virtue of accident, brought on by careless disregard for the conditions exacerbated through abusive training methods.

**COUNT 4: PROFESSIONAL (VETERINARY) MALPRACTICE (AGAINST DR. CAMERON STOUDT DONNELL AND EQUINE SPORTS MEDICINE AND REHABILITATION)**

63. Plaintiffs incorporate and re-allege the foregoing paragraphs by reference.

64. Upon information and belief, the Stoudt Defendants were frequently and routinely utilized by the Gibbs Defendants to care for and provide medication and drugs to the Sneed Horses.

65. Upon information and belief, the Stoudt Defendants were aware of the Strangles outbreak and did not properly care for the Sneed Horses nor contain its spread. The Stoudt Defendants failed to notify Sneed of the outbreak of a highly infectious disease, despite having a duty and obligation to do so.

66. Upon information and belief, the Stoudt Defendants failed to diagnose Ava's condition properly and adequately on the morning of August 10, 2023. Specifically, Dr. Stoudt failed to perform a dorsal-ventral view of the vertebrae; an above-and-below view was necessary, as requested by Dr. Johnson. When the x-ray was finally provided, it was of a substandard quality. As a result, Dr. Stoudt failed to adequately assess surgical repair. In addition, Dr.

    Stoudt failed to take additional x-rays in order to assess secondary sources of injury and paralysis; she failed to collect additional data.

67. Upon information and belief, the Stoudt Defendants were aware of the Gibbs Defendants abusive and dangerous training methods, but despite actual knowledge of extreme abuse in the barn, Dr. Stoudt continued to provide pain medication to Ava without proper examinations and without Sneed's informed consent.

68. Upon information and belief, the Stoudt Defendants exacerbated the risk of injury to the Horses, particularly Ava, by medicating the Horse in order to cover up injuries in the weeks prior to August 10, 2023. Ava's lab work showed that the Horse was dehydrated, suffered muscle spasms, and was medicated with pain killers. Dr. Stoudt's knowledge of these conditions, combined with her inaction, exacerbated the injuries, which led to Ava's death.

69. Upon information and belief, Dr. Stoudt provided an IV to Ava without Sneed's informed consent, despite having an obligation to notify the Horse's owner of care.

70. Upon information and belief, the Stoudt Defendants ignored the fact that Ava was "down in her stall" for quite some time, remarking to Sneed that the Horse may have a "genetic predisposition to a weak vertebra," and stating that "it could have been congenital." Dr. Stoudt make these comments despite her awareness of the Gibbs Defendants cruel, dangerous, and abusive training methods.

71. Upon information and belief, the standard of care when a horse is "down" is to consider flushing the stomach, examining the legs for fractures, performing an Equine Protozoal Myeloencephalitis ("EPM") test in order to determine neurological reasons for paralysis. Then an injury to the neck might be considered. Dr. Stoudt never recommended an EPM

test be done on Ava. Rather, Dr. Stoudt, with knowledge of Gibbs' prior acts, knew to examine, via an x-ray, the <u>exact</u> vertebra that was injured.

72. The Stoudt Defendants were under a duty of care toward the Sneed Horses; Dr. Stoudt had accepted the responsibility of treating the Sneed Horses, particularly Ava. The Stoudt Defendants actions and nonactions did not conform to the professional standard of care and conduct. Such failure to conform to the professional standard of care and conduct was the proximate cause of the injuries and harm to the Sneed Horses. And the injuries and harm to the Sneed Horses resulted in damages to the Plaintiffs—quantified by the loss of life, loss in value of the Horses, loss of the value of future offspring, lost potential sales, loss of future earnings, veterinary care, rehabilitative care, increased insurance premiums, and training charges.

### COUNT 5: *RES IPSA LOQUITUR* (AGAINST ALL DEFENDANTS)

73. Plaintiffs incorporate and re-allege the foregoing paragraphs by reference.

74. The injuries to the Sneed Horses, Ava and Cash in particular, were of a type that does not generally happen without negligence.

75. The injuries were caused by an instrumentality solely in the Defendant's control.

76. The Plaintiffs did not contribute to the cause of the injuries.

77. Sneed has suffered actual losses, quantified by the loss of life, loss in value of her Horses, loss of the value of future offspring, lost potential sales, loss of future earnings, additional veterinary care, rehabilitative care, increased insurance premiums, and training charges.

## DAMAGES

78. As a direct and proximate result of the Defendants' acts and omissions alleged in the foregoing paragraphs, Plaintiffs have suffered damages for loss and injuries in an amount in excess of $75,000 but less than $6 Million, including but not limited to the following damages:

    a. Loss of life.
    b. Loss in value of the Horses.
    c. Loss of future offspring.
    d. Loss of potential sales.
    e. Loss of future earnings.
    f. Veterinary and rehabilitative care.
    g. Increase in insurance premiums.
    h. Training charges.

## EXEMPLARY DAMAGES

79. Defendants' acts and/or omissions are of such a character to rise to the level of gross negligence. Further, Plaintiffs would show that the acts and/or omissions of Defendants were carried out with a conscious disregard for an extreme danger of risk and with actual awareness on the part of Defendants that their acts would, in reasonable probability, result in serious injury to the Horses or death. Defendants caused substantial injury to Plaintiffs and engaged in acts or omissions that, when viewed objectively at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to the Horses. Further, Defendants, personally or through their employees, had actual, subjective awareness of the risk involved in their acts and

omissions, but nevertheless, proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff's Horses.

80. Plaintiffs seek the imposition of punitive or exemplary damages from Defendants without limitation as imposed by § 41.008 of the Texas Civil Practice and Remedies Code.

## JURY DEMAND

Plaintiffs demand a jury trial on all Causes of Action alleged in this Complaint.

## PRAYER FOR RELIEF

Plaintiffs request that Defendants be cited to appear and answer, and that on final trial Plaintiffs recover:

a. Judgment against Defendants for compensatory damages;
b. Judgment against Defendants for exemplary damages;
c. Pre-judgment and post-judgment interest as provided by law;
d. Reasonable attorney fees;
e. Costs of suit; and
f. Any further relief, at law or in equity, to which Plaintiffs may be entitled.

Respectfully submitted,
**KEARNEY, MCWILLIAMS & DAVIS, PLLC**

*/s/ Charles S. North*
**Charles S. North**
SBN: 24095712
cnorth@kmd.law

1235 South Main, #280
Grapevine, Texas 76051
Tel./Fax: 817-764-3459

***Attorney for Plaintiffs***